# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.



**Supreme Court of Kentucky**

2007-SC-000172-MR

DATE 9|17|09 Kelly Klaber D.C.

DONALD LEE ROSS, JR.                                                                                      APPELLANT

V.

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JAMES D. ISHMAEL, JR., JUDGE
NO. 06-CR-00541

COMMONWEALTH OF KENTUCKY                                                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

Donald Lee Ross, Jr., appeals as a matter of right from a February 6, 2007 Judgment of the Fayette Circuit Court convicting him of robbery in the first degree and of being a persistent felony offender (PFO) and sentencing him to twenty years' imprisonment. The Commonwealth alleged and the jury found that Ross, along with two other men, committed robbery at the residence of Claudia Santos-Vasquez on the morning of February 2, 2006, while Claudia, her brother, and her husband were present in the home. The Commonwealth presented evidence at trial showing that Ross held Claudia and her brother at gun point with what appeared to be a sawed-off shotgun while Ross's co-defendant, Keith Dunson, and a third man, Walter Cooper, searched for valuable items to steal. On appeal, Ross now alleges that the trial court erred

by 1) refusing to admit alleged alternate perpetrator evidence, which, Ross alleges, would have demonstrated that another man wielded the shotgun in carrying out the robbery and he was merely a passive participant or not there at all; 2) denying the jury's request during their deliberations for clarification about when Anthony Weathers, who owned the car used in the robbery, had reported his car stolen; 3) refusing to grant his motion for a new trial after learning that Jessica Brown, who stated at trial that she was in the car with Ross, Dunson, and Cooper before the robbery and saw all three men enter the Santos-Vasquez residence, falsely testified that Ross had made threats on her life to prevent her from testifying against him; 4) prohibiting the defense from cross-examining Jessica Brown regarding her alleged delusional behavior. Convinced that the trial court did not commit reversible error in any of the above instances, we affirm his conviction and sentence.

## RELEVENT FACTS

On the morning of February 2, 2006, Walter Cooper was driving around with his friend Donald Ross. Cooper and Ross soon ran into Keith Dunson and Dunson's girlfriend, Jessica Brown. Brown testified that she and Dunson were walking home after visiting Dunson's uncle. After Cooper offered to give Dunson and Brown a ride, the pair accepted and climbed into the back seat of Cooper's car. Brown testified at trial that once she and Dunson were in the car, Cooper told them he was interested in buying drugs from Dunson, but that he did not have any money. Cooper then informed the group that he knew

2

where he could get some money. After Cooper pulled up to an unknown apartment, the three men exited the vehicle and Dunson told Brown to remain in the car.

Cooper knocked on Claudia Santos-Vasquez's apartment door located on Michigan Avenue in Lexington, Kentucky, where Claudia lived with her husband, niece, and brother. Claudia's brother answered the door and encountered three men. According to the Commonwealth, the three men were Cooper, Dunson, and Ross.[1] Although Claudia could not identify two of the robbers, she testified that she recognized Cooper because he frequently visited her apartment in order to sell beer, stereos, and DVD players. Cooper testified at trial that after he, Ross, and Dunson entered the apartment, Ross brandished a firearm and instructed Claudia and her brother to remain on the sofa while he and Dunson went into the bedroom to look for money. Claudia revealed that at one point, the man with the gun pushed the barrel into her stomach, put the barrel into her mouth, demanded money from her brother, and hit her brother with the weapon. Claudia's husband, Perez, who had been sleeping in the bedroom, woke up when Dunson and Cooper came into the room looking for money. Perez testified that one of the men hit him on the head and told him not to look up, so he was unable to identify either man at trial.

---

[1] One of Ross's theories at trial was that he was not present at all at the robbery, and instead, the third robber was Anthony Weathers.

Dunson also testified at trial, and his account of the burglary differed from Cooper's only in regard to his own level of participation. Dunson testified that after he and Ross joined Cooper in the apartment, he saw Ross with what appeared to be a shotgun. Dunson stated that he saw Cooper go into the back bedroom, but that he refused to help Cooper in his search for money and Cooper responded by calling him names and insulting him. Dunson testified that after they left the apartment and drove away, he told Cooper he wanted to get out of the car, but Cooper would not let him. Eventually, Cooper stopped the car and Dunson and Brown exited the car.

The robbers escaped with approximately $1700 in cash, some jewelry, clothes, and a cell phone. Several hours after the robbery, the police found a vehicle that matched the description of the one Santos-Vasquez and a neighbor saw at the time of the robbery. After locating the vehicle and obtaining a search warrant for it, the police found a black change purse, a fake shotgun, and a jail identification card belonging to Anthony Weathers in the car. Although evidence at trial established that Weathers owned the vehicle, Weathers claimed that it had been stolen prior to the robbery. Weathers testified at trial that he had been hanging out with Cooper the day before the robbery. Weathers stated that Cooper accompanied him when he drove to a friend's house, but that Cooper remained in the car, which he left running, while he went into his friend's house to fix a stereo. Weathers explained that when he returned to the car after only a couple minutes, Cooper and the

vehicle were gone. Weathers testified he got a ride to an area of town where he thought Cooper might be and spent the majority of that night looking for Cooper and his car. The next morning at approximately 9 a.m., after not being able to locate his car, Weathers stated that he called the police from his step-father's house to report that his car had been stolen. Weathers stated that he did not learn of the robbery until he saw coverage of it on the afternoon news and did not learn that his car had been involved until the police told him.

On April 19, 2006, Ross, Cooper, and Dunson were indicted for one count of robbery in the first degree, and Ross was also indicted for being a persistent felony offender in the first-degree. Prior to trial, Cooper pled guilty to robbery in the second degree and agreed to testify against Ross and Dunson at trial. Ross's and Dunson's trial began on December 19, 2006, in Fayette Circuit Court. Because no fingerprints of the alleged perpetrators were recovered from the scene, the getaway vehicle, or the fake weapon, and because no items from the robbery were ever recovered, the Commonwealth based its case against Ross and Dunson primarily on the testimonies of Cooper, Brown, Weathers, Claudia Santos-Vasquez, and her husband. On December 20, 2006, the jury acquitted Dunson but found Ross guilty of robbery in the first degree. Ross then waived his right to a penalty phase, pled guilty to being a PFO in the first degree, and entered into a plea agreement with the Commonwealth where his ten year prison sentence was enhanced to twenty years due to his PFO conviction. This appeal followed.

## I. The Trial Court Did Not Err In Excluding Evidence Of A Fake Pistol Found In Cooper's And Dunson's Possession Or In Denying Ross's Motion For A Separate Trial.

Prior to trial, Ross made a motion requesting that he and Dunson be tried separately. Ross argued that a separate trial was necessary because he intended to introduce evidence that Dunson and Cooper had used a fake pistol, which was similar to the fake shotgun used in this case, to carjack and rob Jeffery Riffey nine days after the robbery at the Santos-Vasquez household.[2] Ross contended that this evidence made it more likely that Dunson and Cooper were the principal actors in the Santos-Vasquez robbery, that Ross was either not present or merely a passive participant, and most importantly, that either Dunson or Cooper wielded the fake shotgun in carrying out the Santos-Vasquez robbery. The Commonwealth objected to the introduction of the fake pistol on several grounds. First, the Commonwealth argued that the fake pistol recovered from the Riffey robbery was irrelevant to the current case because it was different in style and construction from the one used in the Santos-Vasquez robbery. Second, the Commonwealth contended that the fake pistol would mislead and confuse the jury because it involved a completely separate robbery. Third, the Commonwealth explained that Cooper would testify that the fake pistol used in the Riffey robbery actually belonged to Riffey. Dunson

---

[2] Cooper and Dunson were arrested based on allegations that they carjacked and robbed Jeffery Riffey on February 11, 2006. When the two were arrested, they were in possession of a fake pistol, which, like the fake shotgun, was wrapped in black electrical tape. While in custody for the Riffey robbery, Cooper and Dunson confessed to being involved in the Santos-Vasquez robbery. Authorities eventually dismissed Cooper's and Dunson's charges relating to the Riffey robbery because Riffey had moved away and was no longer available to testify.

also objected to the admission of the fake pistol, noting its prejudicial effect on him, and moved to sever his trial from Ross.

After hearing arguments on these motions, the trial court denied both motions for separate trials and Ross's request to admit evidence of the fake pistol. The trial court held that the prejudicial effect on Dunson would outweigh any probative value the fake pistol would have for Ross and that the fake pistol was irrelevant to the instant case because it was not similar to the fake shotgun and was allegedly used in an unrelated robbery nine days after the Santos-Vasquez robbery. The trial court concluded that because the evidence of the fake pistol was inadmissible, separate trials for Ross and Dunson were not necessary.

Dealing first with the trial court's decision to exclude the fake pistol, Ross contends that the court prevented him from presenting a complete defense in his joint trial with Dunson because he was unable to introduce evidence showing that Dunson or Cooper actually possessed and wielded the fake shotgun. Ross contends that this evidence should have been admitted under an alleged alternative perpetrator theory ("aaltperp") because it would have shown that someone else, namely his co-defendant Dunson, committed the robbery. A trial court has broad discretion regarding the admissibility of evidence, and its decision in evidentiary matters will not be disturbed on appeal absent a clear abuse of that discretion. Simpson v. Commonwealth, 889 S.W.2d 781, 783 (Ky. 1994). This Court has held that "[t]he test for abuse

7

of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999). Convinced that the trial court did not abuse its sound discretion in excluding the fake pistol, we decline to reverse Ross's conviction on this basis.

A defendant may introduce evidence that someone else committed the offense with which he is charged only if the evidence is relevant and if it survives an application of KRE 403, meaning its probative value must not be substantially outweighed by a "confusion of the issues, misleading the jury, or undue delay." Blair v. Commonwealth, 144 S.W.3d 801, 810 (Ky. 2004). Ross is correct that this standard for admitting evidence of an alternative perpetrator, or "reverse KRE 404(b) evidence," is lower than the admissibility standard for prior bad act KRE 404(b) evidence being introduced by the Commonwealth against the accused. See United States v. Stevens, 935 F.2d 1380, 1404 (3rd Cir. 1991).[3] However, the initial question of relevancy is still the first step for trial courts to determine admissibility, and as noted above, this Court will not disturb a trial court's gate-keeping function unless its

---

[3] This lower standard is justified because when the defendant himself attempts to introduce evidence of an alternative perpetrator, as in reverse KRE 404(b) cases, prejudice to the defendant is not a factor as it is when the Commonwealth introduces prior bad act evidence against the accused. United States v. Stevens, 935 F.2d at 1404. However, this case is not the typical reverse KRE 404(b) case because one of the alternative perpetrators in Ross's theory is Ross's co-defendant, Dunson, who would certainly suffer prejudice by the admission of the fake pistol. The trial court acknowledged this prejudice in making its admissibility ruling. Although this distinction is important to recognize, it is not controlling in this case because the exclusion of the fake pistol is ultimately based on its lack of relevance to the Santos-Vasquez robbery.

8

admissibility ruling is arbitrary, unreasonable, or unsupported by sound legal principles.

Because the trial court correctly determined that the fake pistol was irrelevant to the instant case and because the pistol's admission would have confused the issues for the jury, the trial court did not err in excluding it. Although the trial court did rely in part on Billings v. Commonwealth, 843 S.W.2d 890 (Ky. 1992), to deny Ross's motion, which is not the correct standard for reverse KRE 404(b) evidence, it also held that the fake pistol was simply not relevant to the instant case. Numerous facts in the record support this determination. First, the fake pistol was an entirely different type of gun than the fake sawed-off shotgun used to rob the Santos-Vasquez household. Second, Ross could not prove that the fake pistol belonged to Cooper or Dunson because it was merely found in their possession and because Cooper stated that it actually belonged to Riffey. Third, with Riffey's absence and no complaining witness, Ross could not even prove that the gun was used in the alleged, uncharged robbery. The difference between the fake pistol and shotgun as well as Ross's inability to connect the fake pistol to Dunson or to a subsequent robbery justifies the trial court's determination that Ross's reverse KRE 404(b) evidence was irrelevant to the charges in this case.

Furthermore, an application of KRE 403 demonstrates that the introduction of the fake pistol would have likely confused the jury. As mentioned above, the fake pistol *may have* been involved in a subsequent

9

robbery and *may have* been used by Cooper and Dunson. However, with Riffey unavailable, no charges filed against Cooper or Dunson for the Riffey robbery, and no evidence proving that Dunson ever owned or used the fake pistol, its admission would truly confuse the real issue of the case—Ross's and Dunson's roles in the Santos-Vasquez robbery. Finding Ross's contention that the fake pistol survives a KRE 403 application to be without merit,[4] this Court declines to reverse his conviction on this basis.

Secondly, Ross argues that the trial court erred by denying his motion for a separate trial. This Court "will not reverse on appeal for failure to sever 'unless we are clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion.'" Bratcher v. Commonwealth, 151 S.W.3d 332, 340 (Ky. 2004), *quoting* Rachel v. Commonwealth, 523 S.W.2d 395, 400 (Ky. 1975). Because Ross suffered no prejudice from being tried jointly with Dunson and because joint trials are preferred when defendants are jointly indicted for the same transaction, the trial court did not abuse its discretion in denying Ross's motion for a separate trial.

---

[4] Ross cites to the unpublished Kentucky Court of Appeals' opinion of Nichols v. Commonwealth, No. 2004-CA-000634-MR, 2005 WL 564162 (Ky. App. 2005), to support the admission of the fake pistol as reverse KRE 404(b) evidence. However, Nichols is distinguishable because in that case, the defendant had two witnesses who were willing to testify that the babysitter, as opposed to the defendant, likely caused the victim's injuries. Here, Ross's only evidence that Dunson acted principally in the robbery was a dissimilar fake firearm, which may not have even been owned or used by Dunson, found in his possession nine days after the Santos-Vasquez robbery.

In short, Ross's claim of prejudice depends on his assertion that the fake pistol is admissible. However, as explained above, the trial court correctly determined that the fake pistol was irrelevant to his current charges, meaning it would not even be admissible in a separate trial. Thus, Ross suffered no prejudice from being tried jointly with Dunson because the evidence he wanted to introduce in his joint trial would not have been permitted in a separate trial. Furthermore, this Court has articulated a preference for joint trials when defendants are jointly indicted, and has explained that "defendants alleged to have been involved in the same transaction [but who] have conflicting versions of what took place or the extent to which they participated in it, *vel non*, is a reason for rather than against a joint trial." Bratcher, 151 S.W.3d at 340-41 (internal citations omitted). Therefore, the trial court did not err in trying Ross and Dunson jointly on the robbery charge.

## II. The Trial Court Did Not Err In Denying Ross's Motion To Replay The Entirety Of Anthony Weathers' Trial Testimony.

During the deliberations, the jury submitted a question to the trial court regarding something Anthony Weathers, who owned the car used as the getaway vehicle, had said during his testimony. The jury wanted to know the date and time when Weathers had reported his car stolen. After learning of this one question, Ross requested that the trial court replay Weathers' entire testimony for the jury. In response, both Dunson and the Commonwealth suggested that the trial court simply instruct the jury to rely on their notes and

11

collective memory of Weathers' testimony for the answer to the question posed. After considering these requests, the trial court denied Ross's motion to replay all of Weathers' testimony, noting that the jury had not requested to rehear his testimony, but only to be reminded of when he had reported his car stolen. Ross then suggested that the trial court inform the jury that they could ask to rehear Weathers' testimony, but the trial court stated that it was not comfortable "suggesting or recommending something about the jury rehearing testimony." Thus, the trial court informed the jurors that it could not answer their question and that they should continue their deliberations based on their notes and recollection of the evidence presented.

On appeal, Ross alleges that because Weathers' credibility was so essential to his defense, the trial court abused its discretion by refusing to offer the jury the option of rehearing Weathers' testimony. A trial court's decision regarding how to handle jury questions and whether to replay trial testimony is committed to the court's sound discretion and will only be disturbed on appeal if the ruling was unreasonable, arbitrary, or not based on sound legal principles. Baze v. Commonwealth, 965 S.W.2d 817, 825 (Ky. 1997). Convinced that this claim of error did not amount to an abuse of discretion, we affirm.

Here, Ross is not complaining that the trial court failed to replay Weathers' testimony for the jury when they posed that request. Rather, he is alleging that the court should have at least informed the jury that they had the

12

option of rehearing Weathers' entire testimony. There is no evidence to suggest that the trial court's decision was unfair or unreasonable. The trial court understandably did not want to suggest to the jury that they listen again to Weathers' entire testimony when they had simply requested the answer to a specific factual question. Indeed, if the trial court had suggested that the jury rehear this testimony, the jury could have viewed the court's recommendation as highlighting or giving undue emphasis to Weathers' testimony. See Stokes v. Commonwealth, 275 S.W.3d 185, 192-93 (Ky. 2008) (cautioning courts to exercise restraint in replaying testimony so as to prevent undue emphasis from being placed on portions of the evidence). Thus, the trial court did not abuse its discretion by declining to inform the jury that they had the option of rehearing Weathers' testimony.

Ross also argues in his reply brief that the trial court should have actually replayed the portion of Weathers' testimony that would have answered the jury's question and requests palpable error review pursuant to RCr 10.26 for this unpreserved contention. For an unpreserved error to be deemed palpable, it must be obvious and clear from the record, affect the defendant's substantial rights, and result in manifest injustice. Manifest injustice exists where the defendant can show the "probability of a different result [absent the error] or error so fundamental as to threaten a defendant's entitlement to due process of law." Martin v. Commonwealth, 207 S.W.3d 1, 3 (Ky. 2006).

13

Although this Court does not believe that the trial court erred by refusing to replay any portion of Weathers' testimony, if there was an error, it would not rise to the level of manifest injustice because of the significant evidence introduced at trial showing that Ross was present and participated in the robbery. Dunson, Cooper, and Brown all testified that Ross entered the Santos-Vasquez household. Dunson and Cooper both testified that Ross held the residents at gun point while they went into the back bedroom. In addition, Claudia Santos-Vasquez testified that of the three men, the one who held the gun was not the youngest, which is consistent with Ross wielding the gun because he was thirty-three years old at the time of the robbery, while Dunson was the youngest at twenty-six, and Cooper was the oldest at thirty-seven. Therefore, this claim of error did not result in manifest injustice and cannot be said to be palpable.

### III. The Trial Court Did Not Err By Denying Ross's Request For A New Trial After Learning That Jessica Brown May Have Perjured Her Testimony.

During Jessica Brown's testimony, in addition to revealing information about Dunson's and Ross's involvement in the robbery, she also explained in her cross-examination that the reason she had failed to originally appear as a witness at trial was because she was afraid that Ross would injure her or her family if she testified against him.[5] Brown also claimed that before Ross was arrested, he had asked her a threatening question once at a gas station that

---

[5] Brown was initially subpoenaed as a witness for the Commonwealth, but she failed to show up at trial and had to be arrested to secure her appearance in court.

made her afraid for her life. After the close of the evidence but before the verdict, the trial court held a contempt hearing to address Brown's failure to appear at court. While being questioned by the court, Brown admitted that she was scared to testify because she was afraid people would see her face and not because Ross had threatened her. Brown acknowledged that no one had threatened her or her family and admitted that she had lied about this during trial.

Ross did not raise any objections or present any motions after the contempt hearing regarding the introduction of Brown's alleged perjured testimony during trial. Rather, the day after the jury had returned a verdict finding Ross guilty of first-degree robbery, Ross filed a motion for a new trial, arguing that absent Brown's perjured testimony, the result of the trial would have likely been different. The trial court disagreed and found that due to the overwhelming evidence of Ross's involvement in the robbery, the false portion of Brown's testimony did not have a substantial effect on the verdict. On appeal, Ross complains that Brown's perjured testimony significantly influenced the jury's finding of guilt and argues that the trial court erred by concluding otherwise. The Commonwealth notes, however, that this error is not preserved for appellate review because Ross did not raise an objection to Brown's perjured testimony before the jury returned its verdict. We agree.

A defendant who fails to notify the trial court of an error before the jury returns its verdict, and who raises an alleged error for the first time in his

motion for a new trial has not properly preserved the error for appellate review. Byrd v. Commonwealth, 825 S.W.2d 272, 274 (Ky. 1992), *overruled on other grounds by* Shadowen v. Commonwealth, 82 S.W.3d 896 (Ky. 2002). This Court has specifically prohibited a defendant from "await[ing] the verdict of the jury before presenting an objection to improprieties that occurred during the trial[.]" Patrick v. Commonwealth, 436 S.W.2d 69, 74 (Ky. 1968). Although Ross contends that this error is properly preserved because he raised the objection as soon as he learned of Brown's perjured testimony, the fact remains that he did not. Ross waited until after the jury returned its verdict when he should have made a motion to strike the perjured portion of Brown's testimony immediately following the contempt hearing. Due to this failure to raise the objection until his motion for a new trial, Ross's claim of error is not properly preserved for this Court. Alternatively, Ross notes in his reply brief that there "are reasons to review under RCr 10.26 if there is a lack of preservation."

As noted above, to succeed on a claim of palpable error, a defendant must demonstrate that manifest injustice has occurred, *i.e.*, that there is a "probability of a different result [absent the error] or error so fundamental as to threaten a defendant's entitlement to due process of law." Martin, 207 S.W.3d at 3. Because substantial evidence existed to prove Ross's guilt, this Court cannot say that the trial court committed an error, palpable or otherwise, in denying Ross's motion for a new trial.

16

"[T]he test for whether perjured testimony entitles a defendant to a new trial, focuses on whether there is a probability that introduction of the truth 'would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted.'" Commonwealth v. Spaulding, 991 S.W.2d 651, 657 (Ky. 1999) (internal citations omitted). Here, although Brown stated that she testified falsely regarding Ross's threats against her, the fact remains that her testimony about Ross's involvement in the crime was damaging and consistent with the Commonwealth's other evidence against Ross. She stated that Ross entered the Santos-Vasquez apartment with Dunson and Cooper. Furthermore, Dunson and Cooper both testified that Ross was with them and wielded the shotgun during the robbery. Thus, even though Brown's alleged false testimony did not portray Ross in a positive light, it cannot be said with reasonable certainty that Ross's conviction would be different if the jury knew about Brown's recantation. The recanted testimony did not relate to the crime itself and the jury had substantial evidence on which to rely in finding Ross guilty. For these reasons, Ross has not demonstrated manifest injustice justifying a finding of palpable error.

## IV. The Trial Court Did Not Err In Denying Ross's Request To Cross-Examine Jessica Brown About Her Alleged Delusional Behavior.

During Ross's cross-examination of Brown, Ross's counsel asked Brown whether she was a spiritual person. The Commonwealth objected to the relevance of this question, and the trial court requested the parties approach

17

the bench for a conference. Ross explained that his girlfriend had told him that Brown had conversations with her deceased grandmother, and that this delusional behavior gave him a basis to believe that Brown was not a reliable witness and was "easily suggestible." Ross emphasized that Brown's mental instability was relevant because it made it more likely that she was open to suggestions from others and only implicated Ross after the police told her his name. The trial court disagreed, but informed Ross that if he was concerned about Brown's susceptibility to suggestiveness, he could ask her directly whether the police had suggested Ross's name to her. Otherwise, the trial court held that whether Brown spoke to her deceased grandmother was irrelevant to her testimony about the robbery and that Ross did not have a sufficient basis for inquiring into Brown's mental health.

On appeal, Ross alleges that the trial court erred by prohibiting him from questioning Brown about her delusional behavior and mental instability. We disagree. It is well-settled law that "a trial court does not abuse its discretion in refusing to permit a witness to be cross-examined about his or her mental history where there is no substantial basis for the inquiry." Stopher v. Commonwealth, 57 S.W.3d 787, 799 (Ky. 2001). Despite Ross's contention to the contrary, his girlfriend's unsubstantiated claim that Brown talked with her deceased grandmother does not provide a substantial basis for an inquiry into Brown's mental health. The record reflects no other basis on which to support Ross's inquiry other than his own girlfriend's statement, and that bare

18

assertion is simply not enough. Thus, the trial court did not err in prohibiting this line of cross-examination.

## CONCLUSION

Having considered Ross's various claims of error, this Court finds that the trial court did not commit reversible error in any instance. The trial court properly exercised its discretion in determining that the fake pistol found in Dunson's and Cooper's possession was not relevant to the current charges against Ross; that the jury did not need to be told that they could rehear Anthony Weathers' trial testimony; that the absence of Jessica Brown's perjured testimony would not have changed the verdict with reasonable certainty; and that Ross did not have a sufficient basis for inquiring into Brown's mental health. Therefore, the February 6, 2007 Judgment of the Fayette Circuit Court convicting Ross of robbery in the first degree and of being a persistent felony offender and sentencing him to twenty years' imprisonment is affirmed.

All sitting. Minton, C.J.; Abramson, Cunningham, Noble, and Schroder, JJ., concur.

Venters and Scott, JJ., concur, but would hold that the jury's question should have been treated as a request to review a portion of the testimony, and the failure to allow that review was error, albeit harmless.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Appeals Branch Manager
Department of Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, Kentucky 40601-8204


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Henry Albert Flores, Jr.
Assistant Attorney General
Office of Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, Kentucky 40601-8204